787 P.2d 231

**The STATE of Idaho, Plaintiff–Respondent,**

**v.**

**Randall W. BAINBRIDGE, Defendant–Appellant.**

**No. 16808.**

Supreme Court of Idaho.

Feb. 5, 1990.

Stewart A. Morris, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., argued, Boise, for plaintiff-respondent.

McDEVITT, Justice.

This is a rehearing of an appeal brought by Randall Bainbridge from his conviction for first degree murder following a retrial of the case pursuant to *State v. Bainbridge*, 108 Idaho 273, 698 P.2d 335 (1985). In *State v. Bainbridge, id.*, this Court reversed the first conviction and remanded for a new trial with instructions concerning hypnotically refreshed testimony.

The facts of this case are set forth in *State v. Bainbridge, id.*, and *State v. Sivak*, 112 Idaho 197, 731 P.2d 192 (1986). In summary, Bainbridge and Sivak were convicted of the murder of a service station attendant, Dixie Wilson. Sivak was sentenced to death. Bainbridge received a fixed life sentence.

I. FOURTH AMENDMENT SEIZURES

Bainbridge claims that statements he made to police officers, in the Barrister Station interrogation room, should have been suppressed because they were made pursuant to an illegal seizure that violated his rights under Article I, § 17 of the Idaho Constitution, and the Fourth Amendment to the United States Constitution, made applicable to the individual states through the Fourteenth Amendment to the United States Constitution.

■ When reviewing "seizure" issues, we defer to the trial court's factual findings, unless they are clearly erroneous. We freely review, de novo, the trial court's legal determination of whether or not an illegal seizure occurred. United States Constitution, Amendment IV; *State v. Heinen*, 114 Idaho 656, 759 P.2d 947 (1988). Since Bainbridge is contesting the legality of the seizure, we will review this issue de novo.

The Fourth Amendment is virtually identical to Article 1, § 17 of the Idaho Constitution which reads:

§ 17. **Unreasonable searches and seizures prohibited.**—The right of the peo-ple to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized.

In this case, where no warrant was issued, the proper analysis for determining whether there has been an illegal seizure is to determine:

A. Whether the police conduct in question does, in fact constitute a seizure, and if it does;

B. Whether the seizure falls within one of the recognized exceptions to the warrant requirement. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *State v. Johnson*, 110 Idaho 516, 716 P.2d 1288 (1986).

C. Once it has been determined that there is a constitutionally prohibited seizure, evidence or information acquired as a result of the seizure will be excluded unless the causal connection between the seizure and the acquisition has been broken. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 reh. denied 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

A. WHETHER THE POLICE SEIZED BAINBRIDGE

■ The State argues that this Court's decision in *Bainbridge 1* (that Bainbridge spoke to the police voluntarily) precludes any possible Fourth Amendment violation.

United States Supreme Court decisions hold that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *See also, Florida v. Royer*, 460

U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

The purpose of the Fourth Amendment and Article 1, § 17 of the Idaho Constitution is to protect a person's legitimate expectation of privacy. *See State v. Johnson*, 110 Idaho 516, 716 P.2d 1288 (1986).

Upon making contact with Bainbridge, the officers promptly informed him of his Miranda rights. He stated that he did not want to talk to them until he had an opportunity to consult with his parole officer, but that he did not have a phone. One of the officers "suggested" that the three of them drive to the station house and make the call.

The record is clear that while they were in Bainbridge's house, the officers controlled all ingress and egress. One of the officers followed Bainbridge's spouse into the kitchen and controlled access to the rear door. The other stationed himself next to the front door in the living room where Bainbridge was located.

At this point *no* reasonable person would have thought they were free to leave. The officers' "suggestion" not only reflected a desire for immediate action, but it directed the course of action to be taken. The fact that Bainbridge's spouse told him he did not have to go is inconsequential. She was not the one being taken. She was not in his position.

Shortly after the officers and Bainbridge got into the car, they informed him that they were not going to take him to the Garden City station, but were taking him to the Barrister Station. They did not seek his approval and they did not inform him that he could refuse to go. At this point, Bainbridge was clearly seized and in police custody. The officers had Bainbridge in the squad car and were making unilateral decisions about where they were taking him.

When they arrived at the Barrister Station, the officers immediately took Bainbridge to an interrogation room. One of the officers left to call the parole officer for Bainbridge. The other stayed in the interrogation room. He informed Bainbridge of his Miranda rights and asked him questions. Bainbridge said that he wanted to talk to his parole officer. The detectives gave him a form explaining his Miranda Rights. He signed the waiver portion of that form. The officer continued to ask him questions to which Bainbridge responded. There can be no doubt that Bainbridge's "seizure" was dramatically intensified in the Barrister Station. No reasonable person would feel free to leave under those circumstances.

In Justice White's dissent to the majority opinion in *U.S. v. Mendenhall*, joined by Brennan, Marshall and Stevens, he wrote:

> Whatever doubt there may be concerning whether Ms. Mendenhall's Fourth Amendment interests were implicated during the initial stages of her confrontation with the DEA agents, she undoubtedly was "seized" within the meaning of the Fourth Amendment when the agents escorted her from the public area of the terminal to the DEA office for questioning and a strip-search of her person. In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), we held that a person who accompanied police officers to a police station for purposes of interrogation undoubtedly was "seized in the Fourth Amendment sense," even though "he was not told he was under arrest." *Id.* at 207, 203, 99 S.Ct. at 2253, 2251. We found it significant that the suspect was taken to a police station, "was never informed that he was 'free to go,'" and "would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody." *Id.* at 212, 99 S.Ct. at 2256.[1]

*Mendenhall*, 100 S.Ct. at 1887.

The United States Supreme Court has consistently held that a confession obtained

---

**1.** It should be noted that although White wrote for the dissenters, his opinion that a seizure occurred, represented the belief of seven of the nine Justices who sat. Powell, Burger and

during a custodial interrogation that follows an illegal seizure should be excluded *regardless* of whether the speaker's Fifth or Sixth Amendment rights were violated, and there is but one exception: that is when intervening events break the causal connection between the illegal arrest and the confession so that the confession is "sufficiently an act of free will to purge. the primary taint." *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982); *See also, Brown v. Illinois,* 422 U.S. 590, 599–602, 95 S.Ct. 2254, 2259–61, 45 L.Ed.2d 416 (1975); *Dunaway v. New York,* 442 U.S. 200, 204, 99 S.Ct. 2248, 2252 (1979).

■ In each of the above cases the Supreme Court held that even if the statements were voluntary under the Fifth Amendment and Miranda, the Fourth Amendment issue would remain. In short, the causal connection between an illegal seizure and statements made to the police is not broken by a voluntary waiver of the Fifth Amendment alone.

## B. WHETHER BAINBRIDGE'S STATEMENTS SHOULD HAVE BEEN EXCLUDED AT TRIAL

■ Evidence or information acquired as a result of a constitutionally impermissible seizure will be excluded unless the causal connection between the seizure and the acquisition has been broken. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417 (1963). In further explanation of this rule, the *Wong Sun* court stated:

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or

instead by means sufficiently distinguishable to be purged of the primary taint." *Id.*

In explaining why a voluntary waiver of Fifth Amendment and Miranda rights does not cure an illegal seizure, the U.S. Supreme Court in *Brown v. Illinois* stated:

If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. *See Davis v. Mississippi,* 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969). Arrests made without warrant or without probable cause, for questioning or "investigation" would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving Miranda warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to a "form of words." *See Mapp v. Ohio,* 367 U.S. [643] at 648, 81 S.Ct. [1684] at 1687 [6 L.Ed.2d 1081 (1961)].

It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, *alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. *See Westover v. United States,* 384 U.S. 436, 496–97, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694 (1966).

*Brown,* 95 S.Ct. at 2261 (footnotes omitted).

The Court went on to state:

Blackmun "assumed" that a seizure took place, but agreed with the majority that it was not a constitutionally impermissible seizure. Stewart

and Rehnquist applied the "whether a reasonable person would feel free to leave standard," but found no seizure.

The question of whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse to permit protection of the Fourth Amendment to turn on such a talismanic test. [Referring to a test in which a voluntary waiver of Miranda rights, alone, would be sufficient to break the causal connection following an impermissible seizure, thereby making any statements pursuant to the Miranda waiver admissible.] The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, *see Johnson v. Louisiana,* 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972), and, particularly, the purpose and flagrancy of the official misconduct [2] are all relevant. *See Wong Sun v. United States,* 371 U.S. at 491, 83 S.Ct. at 419. The voluntariness of the statement is a threshold requirement, cf. 18 U.S.C. § 3501. And the burden of showing the admissibility rests, of course, on the prosecution.

95 S.Ct. at 2261, 2262 (footnotes omitted).

In the recently released opinion, *United States v. George,* 883 F.2d 1407 (9th Cir. 1989), the Ninth Circuit Court of Appeals explained the policy reasons behind the three considerations laid out in *Brown.* The court explained that the temporal proximity of the arrest and the confession and the presence of intervening circumstances assist in determining whether the defendant's response to police questioning is sufficiently an act of free will to purge the primary taint of the unlawful invasion. Determining the "purposes and flagrancy of the official misconduct" satisfies the deterrent rationale of the exclusionary rule and has been decisive most often in cases

where police officers did not have probable cause to arrest, but instead took a suspect into custody hoping that an interrogation would yield incriminating statements.

■ The State bears the burden of showing that the causal connection between an impermissible seizure and statements made by the detainee, has been sufficiently broken so as to render those statements admissible at trial. *See Brown v. Illinois,* 422 U.S. at 604, 95 S.Ct. at 2262. However, the *Brown* court also noted that even where the lower courts have failed to undertake the inquiry mandated by *Wong Sun,* the trial may result in a record of amply sufficient detail and depth for the reviewing court to make the determination. As in *Brown,* the record of the trial is amply sufficient for us to determine whether Bainbridge's statements should have been excluded.

## I. THE TEMPORAL PROXIMITY OF THE ARREST SEIZURE AND THE CONFESSION

■ The temporal proximity of the seizure and the confession, in this case, is analogous to the situation in *Brown.* In *Brown,* the defendant was seized at approximately 5:00 p.m. During the twenty minute drive to the police station the officers asked Brown questions which he alternately evaded or answered falsely. Upon arrival at the station house, Brown was placed in the second floor interrogation room. He was left alone for some twenty minutes. Upon returning to the interrogation room the officers warned Brown of his Miranda rights. There was no assertion that he did not understand these rights. Brown's first statement pertaining to the murder in question was separated from his illegal arrest by less than two hours. Later, at approximately 8:45 p.m., three hours and forty-five minutes after his apprehension, Brown specifically said that he wanted to talk about the homicide.

**2.** The court here cited *United States v. Edmons,* 432 F.2d 577 (2d Cir.1970). Other citations omitted.

Like Brown, Bainbridge was seized from his home, asked questions in the squad car on the way to the police station and immediately taken to an interrogation room after arriving at the station. Upon entering the interrogation room, Bainbridge signed a written waiver of his Miranda rights. The officers then engaged him in a discussion pertaining to his activities on the day in question. Bainbridge made no incriminating statements. The officers then left him alone with his parole officer. Following this private consultation, Bainbridge admitted his presence at the time Dixie Wilson was murdered.

### 2. THE PRESENCE OF INTERVENING CIRCUMSTANCES

We hold that properly warning Bainbridge of his Fifth Amendment/Miranda rights by itself was not by itself sufficient to purge the taint of the impermissible seizure.

There is an additional significant factor that distinguishes the circumstances of this case from *Brown.* That is Bainbridge's private consultation with his parole officer. The audio tape of the station house interrogation reveals that after discussing what Bainbridge did on the day that Dixie Wilson was murdered, one of the detectives told Bainbridge the parole officer was there, got up, opened the door, and brought Bainbridge's parole officer, Greg Fisher, into the room. The officers briefly informed Fisher what had transpired in the interrogation room up to that point.

One officer then addressed Bainbridge, saying: "Maybe you want to hear it from Greg whether or not you ought to cooperate with us and be honest with us."

Bainbridge responded: "I know how I sound. I sound frightened."

Officer: "Well, you know a lot of times things happen that-ah-(to Bainbridge) let me finish—okay? A lot of times things happen that when you look at them they look pretty bad; but when you find out the reasons why they happened they're not all that bad, or at least the reasons are a little different. We're not lying to you when we know that you're involved in this. We're not lying to you. You know that you wouldn't be here if we didn't know."

Bainbridge: "Yeah."

Officer: "And, ah (pause), we're interested, naturally, in whether or not you have an account of why it happened or how it could have happened. Don't leave us to just draw the worst conclusion because of what we saw."

Bainbridge: "Yeah."

Officer: "That's important."

The officers left the room.

Bainbridge then discussed the matter with Fisher for approximately the next twenty minutes. Bainbridge admitted to Fisher that he had been with Sivak when Sivak killed Dixie Wilson. Bainbridge denied any active participation in the murder, claiming that he had just watched in disbelief. Fisher then told Bainbridge that the detectives, Vaughn Killeen and Dee Pfeifer, were people that he had worked with before, to which Bainbridge replied: "That's what they were saying. That's why I kinda told them, I told them you know, I let them know that I was telling the truth, but they weren't going to get it out of me." Fisher then repeated Bainbridge's story to him to make sure he had everything straight.

The officers came back to the interrogation room. Within moments after their return, Bainbridge stated: "I give it to you. You knew it all along and I give it to you as clear as a could without admitting it...."

Bainbridge's statement that before meeting with Fisher he would not admit to anything shows he did not intend to admit anything or think that he had admitted anything prior to consulting with Fisher.

Bainbridge's first admission to the officers came after he had been alone with Fisher, the person whom Bainbridge had selected for advice. Bainbridge then told the officer that he had been with Lacey Sivak in the gas station and that he had seen Sivak murder Dixie Wilson. These facts, combined with the fact that Bainbridge, from the time of his first contact

with officers Killeen and Pfeifer had said that he did not want to talk until he had the opportunity to speak with his parole officer, indicate that Bainbridge's private consultation with Fisher was a significant intervening circumstance between the illegal seizure and Bainbridge's incriminating statements.

### 3. THE PURPOSES AND FLAGRANCY OF THE OFFICIAL MISCONDUCT

"The 1 st of the three factors, 'the purpose and flagrancy of the official misconduct,' is 'particularly important' because it comes closest to satisfying the 'deterrence rationale for application of the exclusionary rule.'" *United States v. George*, 883 F.2d 1407, 1416 (9th Cir.1989), *citing United States v. Perez–Esparza*, 609 F.2d 1284, 1289 (9th Cir.1979). "This factor has been decisive most often in those cases where police officers did not have probable cause to effectuate an arrest, but instead took a suspect into custody hoping that an interrogation would yield incriminating statements. *E.g. Brown*, 422 U.S. at 604–05; 95 S.Ct. at 2262–63; *cf. United States v. Howard*, 828 F.2d 552, 556 (9th Cir.1987)." *United States v. George*, 883 F.2d at 1416.

In *Brown v. Illinois*, the Supreme Court explained why the illegal arrest "had a quality of purposefulness:"

> The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning." The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.

*Brown*, 422 U.S. at 605, 95 S.Ct. at 2262 (1975) (footnotes & citations omitted).

It appears that in this case, as in *Brown*, the seizing officers (Killeen and Pfeifer) were on a fishing expedition. While Killeen testified at trial that the only suspects were Bainbridge and Sivak, trial testimony from Detective Pfeifer and Officer Sprague (the reporting officer) indicates something quite different. Pfeifer testified that at the time Bainbridge was seized there were four or five suspects and nothing distinguished Bainbridge from the other suspects. Officer Sprague also testified that there were a few different suspects at this time. The record corroborates Pfeifer and Spragues' testimony. At the time Bainbridge was seized, Sivak had not even been arrested.

There was, however, nothing in the manner of the action of the officers "seizing" Bainbridge to instill surprise, fright or confusion, although Bainbridge stated, as noted, that he was frightened.

### 4. THE RESULT

After considering all of the factors discussed above, we hold that the threshold factor that Bainbridge was properly informed of his Miranda rights, combined with his lengthy private discussion with his parole officer interrupting any police activity, outweigh considerations that militate in favor of excluding Bainbridge's statements made after his conversation with the parole officer.

The case law on this issue speaks in terms of whether or not there is a break in the causal connection. The intervening circumstance inquiry is the most apropos to this question. In this case, Bainbridge's private consultation with his parole officer was a significant intervening circumstance. All along Bainbridge wanted to speak to his parole officer before talking to the detectives. After speaking to his parole officer, his story changed dramatically. And while the purposefulness of the officers' improprietous actions is highly undesirable and should be discouraged, it is simply not enough to overcome the break in the causal connection created by Bainbridge's private consultation with his parole officer, viewed in conjunction with his valid waiver of his Miranda Rights.

Accordingly, we hold that the statements that Bainbridge made in the station house

interrogation on the night of April 8, 1981, were properly admitted at trial.

## II. TESTIMONY OF PREVIOUSLY HYPNOTIZED WITNESSES

Appellant Bainbridge argues that the district court erred in ruling that the pre-hypnotic recall of witnesses Leyden and Chilton was admissible because police reports substantiated their reliability. Both Chilton and Leyden had been at the scene of the crime on the morning that Dixie Wilson was killed. Chilton purchased gasoline and paid for it in the station. He saw Dixie Wilson and he saw two large bearded men. He stated that he sensed something was amiss. Leyden had driven up to the station and was going to go inside, but when she looked into the station she did not see her friend, Dixie Wilson. Instead she saw two men. When one of the men looked at her and started walking towards the door, she decided to leave.

Bainbridge argues that the trial court's ruling was incorrect because: (1) at the time of trial neither Leyden or Chilton had any present memory of certain details they included in their testimony that were extremely damaging to appellant Bainbridge; and (2) the police reports of Leyden's and Chilton's pre-hypnotic statements were not written until after Leyden and Chilton were hypnotized. The police officers attended the hypnotic sessions. The officers' reports could have been influenced by what they heard at the hypnosis sessions. This, Bainbridge argues, combined with the time lapse between the pre-hypnotic statements and the writing of the reports, renders the reports void of any indicia of reliability.

Appellant Bainbridge relies heavily on this Court's opinion in *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984). In *Iwakiri*, this Court set forth six specific safeguards to be used by the district court in testing the admissibility of hypnotically refreshed testimony which were to be considered on a "totality of the circumstances" basis. In Bainbridge's first trial, the post-hypnotic testimony of Leyden and Chilton was admitted. On retrial, the defendant filed a motion to exclude all of Leyden's and Chil-

ton's testimony on the ground that it was inadmissible under *Iwakiri*. The trial court granted the motion in part. The trial court ruled that all testimony and evidence pertaining to Leyden's and Chilton's post-hypnotic recall was inadmissible under *Iwakiri*, but that both witnesses could testify as to matters they recalled prior to being hypnotized.

The six safeguards set forth in *Iwakiri* pertain to post-hypnotic testimony. Accordingly, the trial court properly applied these safeguards in ruling Leyden's and Chilton's post-hypnotic testimony inadmissible. The *Iwakiri* safeguards do not pertain to pre-hypnotic testimony. Regarding pre-hypnotic testimony, the *Iwakiri* court stated:

[T]he trial court may determine that the witness is still competent to testify in areas where the witness's recollection is unmarred by the hypnotic sessions. This may or may not be limited to situations where it is clear that certain parts of a witness's memory of events were in existence before hypnosis and thus is still in existence, untainted, after hypnotic session.

*Id.* at 626, 682 P.2d 571.

The Court then cited *Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982), for the proposition that hypnosis does not render witnesses incompetent to testify to facts "demonstrably" recalled prior to hypnosis. With regard to what constitutes a "demonstrable showing," the *Collins* court stated that:

[T]he party intending to offer the pre-hypnotic recall [should] appropriately record in written, tape recorded or, preferably videotaped form, the substance of the witness' knowledge and about the evidence in question so that the prehypnotic recall may be established. Such recordation must be preserved so that at trial the testimony of that witness can be limited to prehypnotic recall. If such steps are not taken, admission of the pre-hypnotic recall will be error, which, if prejudicial, will require reversal.

644 P.2d at 1296.

Whether the witness testifies in areas unmarred by hypnotic session or de-

monstratively recalled prior to hypnosis, the witness must testify from a *present recollection* of those matters recalled prior to hypnosis. A recording of statements made prior to hypnosis is required as a means of verifying that the witness's testimony at trial has not been tainted by the hypnosis session.

■ The police reports of the pre-hypnosis interviews with Leyden and Chilton indicate that at approximately 6:45 a.m. on the day of the murder, each of the witnesses stopped at the service station and observed two men inside the station. The descriptions in those pre-hypnosis reports indicate that the two men had beards, cowboy hats, and blue jeans. They were described as being in their mid-twenties, white males, approximately six feet tall, and two hundred pounds. Leyden reported that one of them had a pot-belly and that one was bigger than the other.

While portions of Officer Sprague's report are dated April 17, 1981, the details testified to at trial all appear on pages dated April 7, 1981, in Sprague's report. Accordingly, we find no merit to appellant Bainbridge's argument that the reports were written after the hypnosis sessions. We also find it significant that these portions of the police report statements were introduced into evidence in a manner suggested by defense counsel.

Finally, we note that defense counsel's specific objections to Chilton's and Leyden's testimony were sustained. Counsel moved to strike Chilton's testimony that the two men in the station were wearing "light-colored" clothing because in his pre-hypnosis statement he said that they were wearing "dark-colored" clothing. The court granted the motion and instructed the jury to disregard testimony regarding the color of clothing. Counsel objected to Leyden's testimony as to which one of the two men had a "pot-belly" and which of the two men was "taller," because in her pre-hypnosis statement she merely said that one of the two men had a "pot-belly" and one was "bigger" than the other. The court granted this motion and instructed the jury to disregard and strike from their minds this testimony.

In sum, the trial court was very cautious in dealing with Leyden's and Chilton's testimony. Every objection raised by defense counsel was carefully considered and correctly decided. Because the witnesses were only allowed to testify as to their then present memory of details they recalled prior to being hypnotized, and because the police report properly substantiated this testimony as being reliable and untainted by the hypnosis session, we hold that the trial court did not err.

### III. TESTIMONY OF GISH

■ Bainbridge next asserts error in the admission of the testimony of the prosecution witness, Gish. That witness was employed to collect cash receipts from the service station where the crime was committed. She testified that she observed Sivak and another man following her along her driving route approximately one week prior to the murder. She stated her opinion that the passenger in the Sivak vehicle was Bainbridge. Bainbridge asserts that such identification allowed the jury to infer that he was involved through the planning stages of the crime. At trial, Bainbridge argued that he was an innocent, unsuspecting bystander at the crime scene. Bainbridge argues that such testimony should have been excluded because it was unreliable and highly prejudicial, thus he attacks only the weight and credibility of the witness's testimony. We hold that the trial court did not err. The weight and credibility of that testimony was properly a matter for the jury. *State v. Fenley,* 103 Idaho 199, 646 P.2d 441 (Ct.App.1982).

### IV. TESTIMONY OF THE JAIL HOUSE INFORMANT

■ Bainbridge next assigns error to the admission of testimony by one Fazio, a fellow inmate in the jail where Bainbridge was being held prior to trial.[3] Bainbridge

---

**3.** Fazio had been convicted of drug related offenses. He had not been produced for testimony during the *Bainbridge I* trial.

asserts that Fazio's testimony should have been prohibited under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); and *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The court in *Maine v. Moulton* explained how testimony of jailhouse informants implicates defendants' Sixth Amendment rights as follows:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination of whether a particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the state obtains incriminating statements from the accused after the right to counsel was attached. *See Henry,* 447 U.S. at 276, 100 S.Ct. at 2189 (POWELL, J. concurring). However, knowing exploration by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a State agent.

106 S.Ct. at 487.

The record in this case simply does not reveal that the state took affirmative acts designed to circumvent Bainbridge's right to counsel. Detectives Killeen and Pfeifer specifically refused to barter diminished . jail time in exchange for information with Fazio. Furthermore, the detectives specifically instructed Fazio not to question Bainbridge.

While the jailer in this case did instruct Fazio to keep his eyes and ears open when he was brought to the jail, this was two weeks prior to Bainbridge's confinement. This, combined with the fact that the jailer had no connection to Bainbridge or Killeen and Pfiefers' investigation of the case, sufficiently distinguishes this case from the facts in *United States v. Henry.* (In *Henry* government agents instructed an informant who was confined in the same cell block as the defendant to be alert to any statements made by the defendant.)

Contrary to the facts in *Massiah,* Bainbridge was not housed in the same cell as Fazio. They were housed in a cell block that contained single cell units. The prisoners spent most of their hours alone in their own cells. During the hours between 8:00 a.m. and 4:00 p.m., inmates were allowed to leave their own cells and congregate in a meeting room and watch television. Although Fazio had numerous contacts with Bainbridge, including on five or six occasions reviewing Bainbridge trial documents, the crux of his testimony was that once when a number of inmates were gathered in the T.V. room, Bainbridge, comparing a woman on the T.V. screen to the victim, stated: "That's just what she looked like. She had those great big breasts and I was squeezing her while she was squirming around. She had that death quiver." The record indicates that Bainbridge's comment was audible to anyone in the T.V. room and not directed to anyone in particular. Bainbridge's broad publication of the statement proves that he did not expect any attorney client confidentiality or privacy. He spoke to anyone in general and no one in particular. It was mere "happenstance" that Fazio was present and mere "luck" that he told the police. Fazio, by his own admission, had testified at over 1,000 trials. Someone with his proven propensity to "snitch" certainly needed no encouragement from the authorities.

Appellant would have us infer from the fact that Fazio did receive favorable treatment subsequent to the first Bainbridge trial (at which he did *not* testify) that a "deal" had been made with him at the time

he overheard the T.V. room admission. We cannot so infer.

Defense counsel inquired into all matters relating to Fazio's testimony at trial. Fazio, under oath, denied that his testimony was given as a result of a deal made with the police authorities, and denied that he was in any way working for the county as an informant. He also denied that he deliberately attempted to elicit any incriminating statements from Bainbridge. The trial court considered and rejected Bainbridge's argument that Fazio was a paid police-informant. Fazio was subjected to severe cross-examination by the defense, leaving the jury to consider his credibility. Accordingly, the court ruled that Fazio's testimony was not prohibited under *Massiah, Henry* and *Maine v. Moulton.* We agree and affirm.

## PROSECUTORIAL MISCONDUCT

■ Appellant Bainbridge's final attack on the underlying proceeding is that he was denied a fair trial because of prosecutorial misconduct. In essence, Bainbridge claims that "the prosecuting attorney engaged in almost every devious trick during the trial, and numerous incidents of his prejudicial conduct are mentioned throughout appellant's brief...."

All of appellant's arguments relate to either one of two matters. The first is the prosecution's disclosures and attempted disclosures that Bainbridge was on parole at the time of the murder. The second is the prosecutor's attempt to put the victim's character into evidence.

The trial court had specifically ruled information pertaining to Bainbridge's parole status inadmissible. Appellant Bainbridge claims that the prosecutor (1) nonetheless hinted that the defense had portions of a tape recording edited and the transcript thereof excluded; (2) failed to edit one reference on the tape to Bainbridge's parole status; and (3) misquoted and argued the contents of the tape recording in closing arguments.

(1) Defense counsel failed to object to the prosecution's statements now complained of. Furthermore, we find nothing objectionable in the prosecutor's statements because they were merely made in an attempt to get the tapes admitted into evidence and do not indicate a deliberate effort to imply that the defense had the tapes edited.

(2) After the court ordered that portions of the tape referring to Bainbridge's parole status be edited before going to the jury, defense counsel agreed to have the prosecution assume the task of editing. Counsel never checked the available edited versions before they went to the jury. Counsel has thereby waived any right to object. Additionally, counsel has failed to present any kind of compelling argument that this failure to edit one statement in the tape was the result of deliberate misconduct on the part of the prosecutor rather than a mere oversight. We also note that the prosecutor took precautions to prevent Fisher from testifying that he was Bainbridge's parole officer. And, while some hints as to their relationship could be inferred from reviewing the transcript, the prosecutor did not go outside the bounds of what was necessary to establish a foundation for Fisher's knowledge of Bainbridge.

(3) Finally, we do not believe that any of the prosecutor's alleged misstatements were sufficiently egregious to deprive Bainbridge of a fair trial.

We now turn to the matter of character evidence.

■ The trial court sustained defense counsel's objection to the prosecutor's attempt to put the victim's character in evidence. The prosecutor agreed that such evidence was inadmissible. Appellant Bainbridge now argues that in spite of the trial court's ruling and the prosecutor's agreement, the prosecutor portrayed the victim's good character and family status to the jury throughout the trial. In *State v. Izatt,* 96 Idaho 667, 534 P.2d 1107 (1975), we held that the jury is entitled to base its decision on a full and accurate description of the events concerning the whole criminal act. Subsequent to the court's ruling that evidence of the victim's good character was inadmissible, reference was made, at differ-

ent points during the trial, to the victim's being well acquainted with some of her customers and her habit of extending credit to some of the customers in times of financial need. This testimony was clearly relevant to establish the credibility of the testimony of prosecution witnesses Chilton and Leyden, *i.e.*, their familiarity with the victim and her habits. Our review of the record persuades us that no error resulted.

After reviewing the entire record, and analyzing the arguments presented, we hold that there was no prejudicial error. The conviction and sentence are affirmed.

BAKES, C.J., and JOHNSON and BOYLE, JJ., concur.

BISTLINE, Justice, concurring in part and dissenting.

The Court undertook its review of *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), when oral argument was heard on February 1, 1983, the briefs of counsel having been received and perused earlier. The opinion of the Court in *Sivak* was released August 15, 1983, and rehearing was denied on December 27, 1983. The majority opinion at 105 Idaho 902, 674 P.2d 396 gives mention to Randall Bainbridge, saying in one short paragraph that Bainbridge and Sivak were identified as persons present at the murder scene and that the two had been seen together before and after the killing.[4]

Although the Court heard oral argument in *Sivak* on January 13, 1984, the final opinion was not released until March 14, 1985. The records on appeal in the two cases were on a file in this Court at about the same time. The majority in *Sivak* upheld the imposition

of the death penalty, following conviction by a jury. The majority opinion observed that I.C. § 19–2827 "requires us to determine if the sentence imposed is excessive or disproportionate to sentence imposed in similar cases." 105 Idaho at 908, 674 P.2d at 404. The majority's response to the statutory mandate was the simple expedient of declaring that "our review of similar cases involving the death penalty while necessarily limited by the lack of such cases ... does not reveal the presence of any particular excessiveness or disproportionality in this particular case." 105 Idaho at 908, 674 P.2d at 404.[5]

The majority had to be reminded by one of the dissenting opinions of *two* cases, then recent, which should have been—but were not—considered in that review, namely, *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983), and, of course, *State v. Bainbridge,* which was then before us and was undecided other than by Judge Rowett, who had imposed a sentence of life imprisonment. *Major* and *Bainbridge,* both being first degree murder cases, were discussed and compared to *Sivak* for the benefit of the majority at 105 Idaho 911–17, 674 P.2d 407–413. The majority, for whatever reason, obdurately continued ignoring those two recent and similar murder convictions and disparate sentences, which presently may be a problem for the attorney general in Sivak's ongoing federal court habeas corpus proceedings. So much for *Sivak.* Today our focus is on *Bainbridge,* although *Bainbridge* cannot be effectively reviewed without considering *Sivak* in connection therewith, the two being companion cases arising out of the same homicide and resultant charges of first degree murder. There was definitely some

---

**4.** The majority opinion did not explain that the two had been charged jointly and accordingly would have been codefendants at trial. Each had different counsel. Counsel representing Bainbridge filed a disqualification against Judge Robert Newhouse, who continued to preside in proceedings against Sivak. The charge against Bainbridge was tried with Judge Robert M. Rowett presiding.

**5.** On the same page of the *Sivak* opinion is a reference to string citations of cases found in *State v. Creech,* 105 Idaho 362, 670 P.2d 463

(1985), which the court declared it had read for enlightenment in making the statutorily mandated proportionality review. Some of the cases cited in that string were not first degree murder cases. One involved only the charge of assault with intent to commit murder. Recently one member of the Court questioned the validity of such rote citation of obviously-not-reviewed older cases, many of which preceded non-jury involvement at capital sentencing. *State v. Lankford,* 116 Idaho 860, 781 P.2d 197 (1989). I have entertained that same thought.

inter-relation. For instance, Judge Newhouse at Sivak's sentencing utilized a tape and/or transcript of an "interview" of Bainbridge conducted by two skilled officers, absolutely hearsay when being applied against Sivak, who was neither present nor represented. The *Sivak* majority approved, but not convincingly.

The majority opinion in *Sivak* found that the evidence before the trial court was more than sufficient to sustain finding d(6) of Judge Newhouse's sentencing decision, "that the defendant dominates his codefendant, and is primarily responsible for all that occurred." 105 Idaho at 906, 674 P.2d at 402. The codefendant was Randall Bainbridge, who was separately tried. Significant findings made by Judge Rowett in considering mitigating factors in *Bainbridge's* case were these:

(a) Defendant has no previous conviction for the crime of murder, or any crime of violence. His prior offenses are property related.

(b) Defendant has demonstrated a propensity to being manipulated and used by other criminals; and although he participated in these crimes, he would be unlikely to initiate or perpetrate such crimes on his own.

(c) Although he had the opportunity and the encouragement of the co-defendant to do so, defendant did not himself inflict any death threatening wounds on the victim.

105 Idaho at 913, 674 P.2d at 409. Judge Rowett's reason for not imposing upon Bainbridge a sentence of death was his finding "that the mitigating circumstances, particularly that defendant did not himself deliver any death threatening blows to the victim, outweigh the gravity of the aggravating circumstances here so as to make unjust the imposition of the death penalty on this defendant." 105 Idaho at 914, 674 P.2d at 410. Extrapolating from the findings of the two district judges who became well-acquainted with all facets of the homicide, it has been judicially determined that:

(1) Sivak dominates Bainbridge and is primarily responsible for all that occurred.

(2) Bainbridge has no previous conviction for the crime of murder, or any crime of violence. His prior offenses are property related.

(3) Although Bainbridge had the opportunity and the encouragement of Sivak to do so, Bainbridge did not himself inflict any death threatening wounds on the victim.

(4) *Bainbridge has the propensity for being manipulated* and used by criminals, and although he has participated *he would be unlikely to initiate or perpetrate such crimes on his own.* There are, of course, other findings in both cases, but the findings particularized above are uniquely of concern in proceedings at the second trial which followed on reversal of Bainbridge's first conviction. The record also amply sustains a finding that Bainbridge's intellectual level was below average, another important factor to be given thorough consideration in understanding how easily he was manipulated by Sivak. Likewise, given his low intelligence and the ease with which he is manipulated, any reasonable person would take a dim view of the conduct of the two officers in seizing Bainbridge, interrogating him at his home, and continuing to interrogate him after taking him to their own offices. This, too, is found in *Sivak*, 105 Idaho at 917, 674 P.2d at 413 (Bistline, J. dissenting). It is legitimately there, that as responsive to the *Sivak* majority's statement where in upholding the *Sivak* findings in sentencing, the majority upheld the district court's utilization of "[a]n in-depth interview of [Bainbridge which] was conducted, and was included in the [Sivak] presentence report." *Sivak*, 105 Idaho at 906, 674 P.2d at 402. This "interview" was analyzed and discussed at 105 Idaho 917, 674 P.2d 413. This so-called "interview" was in fact a lengthy and stringent interrogation, and exactly that type of custodial interrogation which Justice McDevitt today analyzes and holds impermissibly conducted. He concludes, as did I more than six years ago, that Bainbridge was "seized" by the officers. Not just seized but essentially held prisoner and subjected to lengthy and manipulative interrogations, notwithstanding his protestations that he did not want to

talk with the officers until he could first talk to an attorney, and also to his probation officer. There should be no challenge to Justice McDevitt's holding that the seizure of Bainbridge's person was consummated by the officers' intentional conduct. It is not possible to draw a meaningful distinction between arresting a person and seizing a person. In either event that person is not at liberty to go about his business as he pleases. The Fourth Amendment to the Constitution of the United States guarantees that the people will be secure in their persons against unreasonable searches and seizures. A person is 'seized' within the meaning of the Fourth Amendment when he is accosted by a police officer who restrains his freedom to walk away. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, 903 (1968):

> There is some suggestion in the use of such terms as "stop" and "frisk" that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a "search" or "seizure" within the meaning of the Constitution.... *It is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime—"arrests" in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.*

*Id.* (Emphasis added).

The word 'arrest' is derived from the French word 'arreter,' meaning to stop or stay and signifies restraint of the person, depriving him of his own will and liberty. *People v. Mirbelle,* 276 Ill. App. 533, 540 (1934); *Alter v. Paul, Sheriff,* 101 Ohio App. 139, 141, 135 N.E.2d 73, 74 (1955); 5 C.J. Arrest, § 1, p. 385, n. 2(b). Judge Kaufman reminds us that '... the Fourth Amendment may be construed as encompassing "seizure" of an individual....' *United States v. Bonanno,* 180 F.Supp. 71, 78 (S.D.N.Y. 1960).

The term 'seizure', both in legal understanding and common parlance, connotes the taking of one physically or constructively into custody and detaining him, thus causing a deprivation of one's 'freedom' in a 'significant way.' *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602 [1612], 16 L.Ed.2d 694 (1966). It involves a real interruption of one's liberty of movement, as a result of such detention. *Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168 [171], 4 L.Ed.2d 134 (1959); *Moran v. United States,* 404 F.2d 663, 666 (10th Cir.1968); *People v. Williams,* 56 Misc.2d 837, 840, 290 N.Y.S.2d 321, 323 (1968); *Sobel,* 'Search & Seizure,' p. 64.

Accordingly, there are essentially two elements to a technical arrest. The first such element is that an accused 'individual'—a human being—is involved as the subject of the action, and not the generic 'person,' which under legal definition may include a corporation [P.L. § 10.00(7)]. Secondly, there must be present a 'seizure' of such individual. As hereinabove defined, that term means essentially the subjugation to restraint *or submission to custody of the accused individual. Long v. Ansell* [69 F.2d 386 (D.C.Cir.1934)], *supra; United States v. Bonanno, supra; State v. Terry,* 5 Ohio App.2d 122, 127–128, 214 N.E.2d 114, 119 (1966); 39 N.Y.U. L.Rev. 1093, 1096 (1964).

*People v. P.A.J. Theater Corp.,* 72 Misc.2d 354, 339 N.Y.S.2d 152, 155 (emphasis added). Anyone knows that an arrest is a seizure. A person who has been arrested is no more free to move about that than a person who has been seized, and vice versa. A distinction without a difference is that the officer *may* come forth with the utterance, "You are under arrest," whereas in a seizure that formality is dispensed with.

With that in mind, after agreeing with Justice McDevitt to that extent, I now go down a ready path which has been traveled before by two Idaho jurists for whom the bench and bar, including myself, have always had the utmost respect for because of their adherence in criminal cases to statutory requirements and constitutional principles. First, we turn to a decision authored

by Judge Towles of the First Judicial District seven years ago which was reversed in *State v. LaMere*, 103 Idaho 839, 655 P.2d 46 (1982). The facts in *LaMere* are only slightly different from those we have before us in *Bainbridge*, and no different in regard to a person being arrested rather than seized, or vise versa. As here, in Bainbridge's circumstance, LaMere initially was not charged with a crime, but was at 5:00 a.m. "arrested" and thus deprived of his liberty so that he could be questioned. LaMere was read his Miranda rights by the officers but not handed a printed form. He was questioned by different officers and put in a cell. Later, at 4:35 p.m., he was brought out and further interrogated. He was transported by the officers from Kellogg, Idaho, to Wallace, Idaho, a distance of some eleven miles, and finally arraigned at 5:05 p.m. Bainbridge was first confined in his own home, questioned there, and then taken in a police car for a drive to police headquarters where he was further interrogated. Not just interrogated, but pumped full of police officer suggestions as to the advantages of cooperating.

Another similarity between *LaMere* and *Bainbridge* was the officers' use of tape recording machines, the on/off switches of which they controlled. In suppressing the statements obtained from LaMere under those conditions, Judge Towles laid out the law on the procedures which officers are required to apply:

> Defendant contends that the failure to comply with I.C. § 19–853(e) invalidates the statements made by the defendant while in police custody on October 23rd, 1978, and furthermore, *the delay in taking the defendant before a Magistrate in violation of Idaho Code Section 19–615 and Idaho Criminal Rule 5(a) deprive such statements of the necessary voluntariness required by the constitution and statutes of the United States and this state.*

> . . . .

> When an arrest is made without a warrant by a peace officer or a private person the person arrested must, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and an information, stating the charge against the person must be laid before such magistrate. I.C. § 19–615.

> As to the requirements of notifying the defendant of his right to counsel, Idaho Code Section 19–853 provides in part as follows:

> *If a person who is being detained by a law enforcement officer*, or who is under formal charge of having committed, or is being detained under a conviction of a serious crime, *is not represented by an attorney* under conditions in which a person having his own counsel would be entitled to be so represented, *the law enforcement officers concerned*, upon commencement of detention, or the court, upon formal charge, as the case may be *shall: (1) clearly inform him of his right to counsel and of the right of a needy person to be represented by an attorney at public expense; and* (2) if the person detained or charged does not have an attorney, *notify the public defender* or trial court concerned, as the case may be, *that he is not so represented.* . . .

> . . . .

> (e) Information given to a person under this section is effective only if: (1) it is in writing or otherwise recorded; (2) he records his acknowledgement of receipt and time of receipt, or, if he refuses to make this acknowledgment, the person giving the information records that he gave the information and that the person informed refused to acknowledge it; and (3) the material so recorded under (1) and (2) is filed with the court next concerned.

> Contrary to the State's contention I.C. § 19–853 clearly pertains to any defendant, whether needy or not, and is one of the warnings mandated by *Miranda*. *The Idaho statute adds an additional requirement to the Miranda case and was designed to ensure the fact that the warning could be proved as well as the*

*acknowledgment and understanding by the defendant.*

. . . .

As to the statement taken from the defendant at or about 4:35 p.m., on October 23rd, 1978, it is apparent that the *Miranda* Warning and acknowledgement of the warning was contained on the taped statement and that the tape of such statement was filed with the Court next concerned at the time of the suppression hearing.

However, it certainly would be more preferable for a written *Miranda* Warning to be acknowledged in accordance with the statute to further support the voluntariness of such statement. *The original interview by the Chief of Police and Officer Wadsworth, of course, did not comply with the statutory requirement in any fashion, and as a result, such statement must be suppressed.*

The next serious question involves the delay between the arrest and presenting the matter to a Magistrate for arraignment.

> The voluntary character of a confession obtained prior to arraignment *is placed in doubt* when there is an unreasonable delay between arrest and arraignment, however, the confession is not per se inadmissible. *State v. Wyman,* 97 Idaho 486 [547 P.2d 531 (1976)].[6]

As to the delay in arraignment, it is the Court's opinion that there was no reasonable excuse nor was the delay itself reasonable. If the police officer had probable cause to arrest the defendant, he also had sufficient probable cause to present the facts to a Magistrate for the issuance of a Warrant of Arrest and to permit the Magistrate to fix bond, if appropriate. Therefore, the excuse that the officers were too busy or were gathering additional evidence and therefore could not taken the defendant before the Magistrate, *is not credible.* If further

evidence needed to be secured, the arrest should not have been accomplished.

This lends credence to the defendant's argument that *the delay was for the purpose of obtaining a statement more than for any other reason, and cannot be condoned by the Court as a clear violation of the duty of a police officer to present an accused before a neutral and detached Magistrate 'forthwith.'* The day in question was a Monday and the Court was open and available.

The Court therefore concludes that any statement volunteered by the defendant at the time of the initial booking would not be suppressed, *but the violation of I.C. § 19–853 would invalidate the subsequent interrogation of the defendant by the Chief of Police and Officer Wadsworth, and the delay in taking the defendant before a Magistrate would dictate a finding that the taped interview at 4:35 p.m. was not voluntary on the part of the defendant,* and hence, may not be used at the time of the trial.

*State v. LaMere,* 103 Idaho at 874–75, 655 P.2d at 81–82 (1982) (appendix to opinion of Bistline, J., concurring in part and dissenting) (emphasis added).

Bainbridge's rights under Idaho law, putting aside constitutional questions, were violated far more than were LaMere's. To so seize a person, manipulate him, and interrogate him when all the while he should be taken before a magistrate was impermissible, highly prejudicial, and tainted the ensuing interrogations—no matter where conducted. The case here is also reminiscent of *State v. Monroe,* 101 Idaho 251, 611 P.2d 1036 (1980), *vacated* by 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 385 (1981), where it required intervention by the Supreme Court of the United States to deter this Court from allowing such tactics of interrogation in a coercive setting. *State v. Monroe,* 103 Idaho 129, 645 P.2d 363 (1982). In any reasonable view Bain-

---

**6.** This paragraph acknowledges the existence of the *Wyman* holding, which was wholly unacceptable to Justice Bakes, joined by Justice McQuade. As will be shortly seen, it is obvious

that Judge Towles found the views of Justice Bakes to be more in comport with Idaho statutory law and constitutional requirements than the views of the *Wyman* majority.

bridge's conviction based on tainted evidence cannot be allowed to stand.

That which Justice Bakes wrote in dissent in *State v. Wyman,* 97 Idaho 486, 547 P.2d 531 (1976), applies like a glove to a hand in considering the manipulative exploitation of Bainbridge. He wrote carefully in applying the prevailing statutory law and constitutional holdings to the facts before the Court:

> The defendant was not taken forthwith before a magistrate after he was taken into custody at 3:00 a.m. Instead he was alternately questioned or confined in a cell for the *following sixteen hours,* at which time he was then formally arrested. He was not presented before a magistrate then, either, but waited approximately *another 40 hours before he was brought before a magistrate.* Thus, I think *it is clear that although the defendant had not been formally arrested before 7:00 p.m., December 2, he had been under arrest since 3:00 a.m.* that morning, and under the terms of the statute and the rule he was entitled to be brought before a *magistrate, whose duty* under I.C.R. 5(d) *would have been to determine whether there was probable cause to believe that the defendant had committed a crime, and to advise the defendant of his rights and provide him with counsel to advise him concerning those rights.*
>
> *Furthermore, the defendant had a right under the Fourth Amendment to the Constitution of the United States to be brought before a judicial officer to determine whether there was probable cause to believe that he had committed an offense.* This right was explained in the recent case of *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).
>
> . . . .
>
> [O]nce the defendant is arrested, whether the officer has made a mistake or not, the Fourth Amendment requires that the defendant be taken before a magistrate. Furthermore, our rule and statute require that it be done and a complaint filed 'forthwith' and 'without unnecessary delay.'

. . . .

> When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty. *Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint on liberty following arrest.* 420 U.S. at 113, 95 S.Ct. at 863 [emphasis in original].

Thus, while the police officers were certainly justified in taking the defendant into custody, *the defendant's prolonged detention without being brought before a magistrate was a violation of his rights under I.C.R. 5, I.C. § 19–615, and the Fourth Amendment to the Constitution of the United States.* The majority opinion recognizes this violation and scolds the police for failure 'to comply with I.C. § 19–615 and I.C.R. rule 5(a).'

. . . .

The purpose of I.C.R. 5 and of the Fourth Amendment is to prevent an arrestee from being held in an extended illegal confinement. . . . The arrestee's constitutional right under the Fourth Amendment to a probable cause hearing following a warrantless arrest [or seizure] cannot be protected if the admissibility of statements the arrestee has given during the illegal confinement which are a product of the illegal confinement is tested solely against the Fifth Amendment's test of voluntariness. The United States Supreme Court, which we are required to follow, has chosen not to evaluate violations of Fourth Amendment rights purely on the basis of voluntariness. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). By analyzing the admissibility of statements taken during an unlawful detention solely in terms of the arrestee's Fifth Amendment interests, the majority has failed to consider the critical questions before us.

. . . .

In *Brown* [*v. Illinois, supra*], the Supreme Court of the United States held that the *Miranda* warnings were not a cure-all which made statements taken following an illegal arrest [or seizure] admissible into evidence. In *Brown*, the Supreme Court of the United States characterized the lower court holding in the following manner:

> The court, in other words, appears to have held that the *Miranda* warnings in and of themselves broke the causal chain so that any subsequent statement, even one induced by the continuing effects of unconstitutional custody, was admissible so long as, in the traditional sense, it was voluntary and not coerced in violation of the Fifth and Fourteenth Amendments.

422 U.S. at 597, 95 S.Ct. at 2258.

The *Court then went on to hold that* a confession or *statement obtained by the exploitation of an illegal arrest [or seizure] is not admissible merely because it follows a Miranda warning and a waiver of Miranda rights.*

> [T]he *Miranda* warnings, *alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.
>
> . . . .
>
> While we therefore reject the *per se* rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative *per se* or "but for" rule. . . . The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is òbtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest [seizure] and the confession, the presence of intervening circumstances, . . . and, particularly, *the purpose and flagrancy of the official misconduct are all relevant.* . . . The voluntariness of the statement is a threshold require-

ment. . . . And the burden of showing admissibility rests, of course, on the prosecution.

422 U.S. at 603–04, 95 S.Ct. at 2261–61 (footnotes omitted).

I believe *the same rule should be applicable during an extended confinement following an arrest without a warrant* [or seizure] whenever the arrestee has not been brought before a magistrate without unnecessary delay and would adopt the holding of *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972).

. . . .

> [W]e think it appropriate to follow the federal approach and *exclude all evidence obtained during 'unnecessary delay' except that which . . . has no reasonable relationship to the delay whatsoever.*

290 A.2d at 419.

. . . .

I cannot agree that no lengthy interrogations took place. *The defendant was regularly interrogated from 5:00 a.m. Saturday morning to 4:30 p.m. Saturday afternoon.* He had not eaten or slept for nearly twenty hours before questioning began, and did not eat or sleep during the next twelve hours over which he was interrogated. The record indicates that he was bereaved at the loss of June Diggs, an intimate friend for five years. He had consumed five beers and three or four shots of whiskey on an empty stomach prior to the shooting. *The appellant was in no condition to make a knowing and intelligent waiver of his rights and could easily be intimidated in such a situation.* . . . I think it is clear as a matter of law that the defendant did not give his statements after a knowing and intelligent waiver of his rights. I believe the case of *Commonwealth v. Eiland,* 450 Pa. 566, 301 A.2d 651 (1973), which the majority has cited in footnote 9 of its opinion, points to the result which we should reach in this case.

> [T]his Court has emphasized that when "[t]he questions in the voluntariness area have *passed beyond the physical*

coercion stage to the much more difficult area of psychological coercion ... a close analysis of all the surrounding circumstances is necessary." *Commonwealth ex rel. Butler v. Rundle,* [429 Pa. 141, 239 A.2d 426 (1968)], and that "the test for any involuntary confession, must concern itself with those elements impinging upon a defendant's will." *Commonwealth v. Baity,* 428 Pa. 306, 315 n. 7, 237 A.2d 172, 177 n. 7 (1968). Thus in the instant case *we must weigh all the factors influencing appellant's will at the time he made his statement.* The record evinces *uncontradicted* evidence that appellant, a 20-year-old with a tenth grade education, was isolated for several periods of time; that upon his initial interrogation he refused to admit involvement in the shooting; *that eleven hours later when told by the police he would get more lenient treatment if he confessed, he signed an incriminating statement; and that he was not arraigned until some twenty-five hours after arrest.*

The *combination of all these factors* based on the Commonwealth's uncontradicted evidence *constituted a subtle but nonetheless powerful form of impermissible psychological coercion. . . .* We conclude that appellant's signed statement was involuntary and should therefore have been suppressed.

301 A.2d at 654–655 (emphasis added). *The reasoning of the Pennsylvania Court is applicable in this case.* At the time of his arrest the defendant was bereaved and possibly in a state of intoxication; he was questioned and refused to admit any connection with the shooting; he was then told that his first story was a lie and that the truth was wanted; he was then intermittently questioned over a ten hour period during which time he had gone without food or sleep for up to thirty hours. The defendant was not a habitual arrestee familiar with the techniques of questioning and knowledgeable of his rights. *Given all these factors,*

the circumstances were inherently coercing, and his waiver was not knowing and intelligent. Accordingly, *I would hold that his written statements and the tape recorded oral statements were inadmissible.*

For all of these reasons I would remand for a new trial. *Wyman,* 97 Idaho at 496–501, 547 P.2d at 541–546 (Bakes, J., dissenting) (emphasis added).

When reviewing the circumstances of the seizure of Bainbridge in light of the extensive discussion of applicable law made by Justice Bakes and Judge Towles, much of which is in accord with that which Justice McDevitt has written, it is abundantly clear that Bainbridge was not only seized, but held by the officers for an inordinate period of time during which they interrogated him at will, and subjected him to inherently coercive tactics. It is equally clear from the record that he did not make an intelligent and knowing waiver of his constitutional rights, and that the officers made no attempt at ascertaining that he understood the rights set out on the printed form which they caused him to initial.

Rating the manipulation to which Bainbridge was twice exposed on a scale of one to ten, giving Sivak a rating of one would entitle the officers in *Bainbridge* to a ten. The statutory law was *purposefully* ignored, and constitutional requirements of the United States Supreme Court might as well have not been written. The officers implicitly alternately threatened Bainbridge and held out promises in attempting to obtain his "cooperation." Had they disdained such tactics and treated him as the Idaho statutes require and the Constitution demands, there is no reason to believe that they could not have yet prevailed in obtaining a statement from him which would establish that Sivak had been present at the murder site and administered the death-dealing wounds.

Counsel for Bainbridge, Mr. Stewart Morris, has also provided the Court with an excellent account of the seizure and cloistered interrogation of Bainbridge, interposing it with the applicable law as noted by Justice Bakes and Judge Towles, and, as of

today, Justice McDevitt. Excerpts from that brief are attached as Appendix A.

Having agreed with what Justice McDevitt has written regarding the seizure and much of the interrogation of Bainbridge, *I am unable to agree that*, on consideration of the totality of the entire scenario, *the causal connection between the illegal seizure and the acquisition of evidence has been broken.* Majority Op. p. 235. The quote from *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), which follows that principle is here inapplicable simply because the "exploitation of illegality" in the manipulation of Bainbridge *never ceased.*

Justice McDevitt, at that point, inserts into his opinion three paragraphs from *Brown v. Illinois,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the same *Brown* which Justice Bakes discussed in his *Wyman* opinion. One cannot read *Brown* and disregard it, and disregard *United States v. George,* 883 F.2d 1407 (9th Cir.1989), and reasonably come to the conclusion that the officers' long and calculated delay in producing Bainbridge's parole officer so that the two of them could converse in private (with the police tape recorder recording all that was said) was the *"additional* significant factor that distinguishes the circumstances of the case from *Brown."*

Totally incomprehensible to my mind is that the majority opinion even goes so far as to see nothing amiss in the quoted statements by the officers as they set the stage for the "private visit." Those remarks not only would have a telling effect upon Bainbridge, but on the parole officer as well. Unmentioned and put out of mind in the majority opinion is any consideration of the long delay in bringing the parole officer together with Bainbridge, and the lack of any explanation, reasonable or not, for the delay. Equally missing is any disclaimer by the parole officer and the two officers that there was no discussion between them as to what best for the prosecution would come out of the "private visit." Equally not discussed in the majority opinion is that Bainbridge's diminished mental capacity made him easy prey for any and all manipulative exploitations. Not an iota of thought is given to Bainbridge also having made known that he would like to talk to an attorney.

The trial court's reason for not suppressing the evidence, as pointed out in my *Bainbridge I* opinion, 108 Idaho 273, 299, 698 P.2d 335, 461 (1985), was *"clearly predicated on the basis that* notwithstanding a request to have counsel, *Bainbridge thereafter waived that right,* and that it was a waiver intelligently and knowingly made." The trial court's equivocal ruling was set out immediately preceding the foregoing:

> Therefore, even accepting the testimony of Mr. Bainbridge, he at best made an equivocal request for counsel. The record indicates that he was primarily desirous of having his parole officer present, and only wanted an attorney if his parole officer couldn't be there. He did not clearly assert a right to counsel prior to that interview on the 8th. R., p. 192.

*Bainbridge I,* 108 Idaho at 299, 698 P.2d at 461. The trial court was thus presented with the opportunity to declare Bainbridge's testimony incredible, or maybe just not as weighty as that of two officers, but to the court's credit did not opt for that easy way out.

Justice McDevitt has written, and I am quick to agree, that properly warning Bainbridge of his fifth amendment/*Miranda* rights was not by itself sufficient to pure the taint of the impermissible "seizure." Nor is the supposed "significant factor" all that significant. The arrival of and utilization by the two officers of the parole officer has all the earmarks of a hoax, all done at the expense of a person who had been illegally seized, kept for an extended period of time in close custody, denied on his expression of wanting the aid of an attorney, and illegally subjected to continued interrogation by professionals with exceptional ability. "In order to assure the effective assistance of counsel as required by the Sixth Amendment, the state should provide counsel at the earliest feasible time after the accused is taken into custody."

**266**

*State v. Wuthrich,* 112 Idaho 360, 362, 732 P.2d 329, 331 (1987).

If the criminal justice system in Idaho is to be accorded any measure of respect, the integrity of the system can only be maintained here by finally giving this defendant a fair trial.

## APPENDIX A

Their intention being to interview the Appellant about the murder, detective Killeen had placed a notification of rights/waiver form in his notebook, and brought it with him into Appellant's house. The Appellant was presented with the rights/waiver form, and requested to complete and sign the form so that the detectives could talk to him. Apparently at that time, as well as in his subsequent interrogations at the law enforcement building that evening and the following day, Appellant's rights were neither read nor explained to him verbally by the officers. Simply presenting a proposed interrogee with the rights form and requesting him to initial and sign it was the detective's standard procedure for both advising and procuring a waiver of a suspect's Miranda rights. (See, for example, the bottom of page 1 and top of page 2 of the Transcript of Appellant's 4/9/81 interrogation, where Killeen tells the Appellant: 'Okay, why don't you take this and read your rights and go ahead and initial, just like you did yesterday.' Also, Pfeiffer testified that he simply asked the Appellant to 'complete the rights form' at the house. 81 Tr., PTH,* P. 52).

At that time, the Appellant refused to sign the rights form, indicating that he did not want to talk to the detectives at that time. (Tr., Vol. VI, p. 1017, 11, 1–5) Killeen testified that the Appellant indicated he would 'probably' talk to him, but wanted to talk to his parole officer first. (Tr., Vol. VI, p. 1016, 11, 1–7; Tr., PTH, p. 154, 11. 14–25).

* The suppression hearing.