**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 43013**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2016 Opinion No. 78 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: December 5, 2016 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| MATTHEW ELLIOT COHAGAN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Thomas J. Ryan, District Judge.

Order denying motion to suppress, <u>reversed</u>; judgment of conviction, <u>vacated</u>.

Eric D. Fredericksen, State Appellate Public Defender; Maya P. Waldron, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Judge

Matthew Elliot Cohagan appeals from his judgment of conviction for possession of a controlled substance and the district court's order denying Cohagan's motion to suppress all evidence seized as a result of his unlawful detention. Cohagan specifically argues that, because the evidence was a direct result of his unlawful detention, the exclusionary rule prohibits the admission of the evidence, and therefore the district court erred in denying Cohagan's motion to suppress. For the reasons explained below, we reverse the district court's order and vacate Cohagan's judgment of conviction.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

We incorporate the district court's findings of fact from its order denying Cohagan's motion to suppress:

1

On February 26, 2014, shortly after noon, [a senior officer] came into contact with the defendant, Matthew Elliot Cohagan. He and [a junior officer] were driving southbound on 12th Avenue South and [the senior officer] testified that he saw the defendant standing on the southwest corner of 12th Avenue South and 7th Street South in Nampa, Idaho. [The senior officer] thought that the defendant resembled another individual [M.M.] who had an outstanding arrest warrant. To further check this out, [the officers] turned around to get a better look at the defendant. However, by the time they drove through the intersection, the defendant had entered the [grocery store] on 12th Avenue and 7th Street in Nampa, Idaho.

The officers entered the [grocery store] and [the junior officer] made first contact with the defendant inside. According to [the senior officer], [the junior officer] asked for his identification and the defendant complied. His identification showed that he was Matthew Elliot Cohagan and not the individual that [the senior officer] believed he resembled. After this consensual contact, both officers left [the grocery store].

Before they left the parking lot, [the senior officer] testified that dispatch or another officer wanted them to go back into [the grocery store] to obtain surveillance video for an unrelated incident. He stated that while [the junior officer] went to obtain the video, he went to find the defendant because he wanted to confirm [the junior officer's] identification of the defendant. [The senior officer] felt that the defendant may have given [the junior officer] a fake identification so he wanted to confirm for himself that the defendant was not the individual that he initially believed him to be. [The senior officer] found the defendant shopping in one of the aisles. At the outset of this encounter, [the senior officer] activated his lapel video camera and recorded his contact with the defendant.

The video was admitted into evidence as Exhibit No. 1. According to the video, [the senior officer] approached the defendant and asked for the defendant's name and his identification. The defendant handed his identification to [the senior officer]. [The senior officer] told the defendant that he resembled another man that the officers were looking for. [The senior officer] then asked the defendant if he had any outstanding warrants. The defendant stated that he did not and told [the senior officer] that [the junior officer] had already spoken with him. [The senior officer] replied, "Let me check if you don't have any warrants." [The senior officer] also told the defendant to keep his hands out of his pockets. Then [the senior officer] asked defendant a second time if he had any outstanding warrants. During the entirety of this contact and questioning of the defendant, [the officer] held onto the defendant's identification.

While [the senior officer] waited for dispatch to respond to the warrant check, the defendant asked if he could continue shopping. [The senior officer] told the defendant that he could but seconds later, he quickly caught up to the defendant and told him to walk with him to the front of the store and to relax. At this time in the video, dispatch still had not confirmed whether or not the defendant had any warrants.

While walking to the front of the store, the defendant placed his hands in his pockets. [The senior officer] reached out and grabbed the defendant's arm and told him to keep his hands out of his pockets. The defendant stated, "Listen, I'm gonna ask you please don't do this in the store." [The senior officer] replied again by telling the defendant to keep his hands out of his pockets. At this point, it is evident from the video that dispatch still had not confirmed any warrants.

On the video, [the junior officer] and the defendant stood inside [the grocery store] at the front of the store and waited until the warrants were confirmed. As the three men walked out of the store, the defendant started walking faster and [the junior officer] told the defendant, "You don't want to do this in the store." On the video, it appears that dispatch confirmed the existence of an outstanding arrest warrant. While still inside the store, [the senior officer] told the defendant to put his hands behind his back and told the defendant that he was under arrest. As they exited the store, the video reveals yelling and an obvious struggle before the video shuts off.

[The senior officer] testified that there was indeed a struggle as the three men left the store and his lapel camera was knocked off. [The senior officer] stated that the struggle started when the defendant attempted to get away from them so [the officer] tripped the defendant and all three men went down to the ground just outside the front doors of the grocery store.

Officers were able to handcuff the defendant. During the search incident to arrest, officers discovered a yellow box containing a glass-smoking device with white crystal residue that tested positive for methamphetamine. According to the Probable Cause Affidavit, inside the box was a bag that contained 2.3 grams of methamphetamine.

The State charged Cohagan with possession of a controlled substance and a persistent violator enhancement. Cohagan filed a motion to suppress all evidence seized as a result of his unlawful detention. The State conceded an unlawful seizure occurred when the senior officer held onto Cohagan's driver's license to run a warrants check. The State argued, however, that any resulting taint from the unlawful seizure was cured upon the discovery of the outstanding warrant. In its memorandum decision, the district court acknowledged that "it is undisputed that [the senior officer's] contact with the defendant in the grocery store transformed from a consensual contact to an unlawful detention." However, the district court concluded that the discovery of the outstanding warrant was an intervening factor attenuating the taint from the unlawful seizure. The district court therefore denied Cohagan's motion to suppress. Cohagan pled guilty to possession of a controlled substance and, in exchange, the State dismissed the persistent violator enhancement. Cohagan timely appeals.

3

## II.

## ANALYSIS

The standard of review of a suppression motion is bifurcated. This Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found. *State v. Holland*, 135 Idaho 159, 161, 15 P.3d 1167, 1169 (2000); *State v. Spencer*, 139 Idaho 736, 738, 85 P.3d 1135, 1137 (Ct. App. 2004). At a suppression hearing, the power to assess the credulity of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

Cohagan argues that because the evidence seized was a direct result of a Fourth Amendment violation, it must be suppressed. The United States and Idaho Constitutions prohibit unreasonable searches and seizures of persons or property.[1] U.S. CONST. amend IV; IDAHO CONST. art. 1, § 17. If evidence is obtained in violation of the Fourth Amendment, the exclusionary rule bars the admission of such evidence. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). However, suppression is not justified unless "the challenged evidence is in some sense the product of illegal governmental activity." *United States v. Crews*, 445 U.S. 463, 471 (1980).

As a threshold issue, the State maintains the initial encounter was not unlawful. In response, Cohagan argues that because the State conceded below that "the defendant was unjustifiably seized," the State may not argue otherwise on appeal because relieving the defense of its burden to prove that a seizure occurred establishes that a seizure indeed occurred. Whether a seizure occurred is a question of law over which this Court exercises free review. *State v. Bainbridge*, 117 Idaho 245, 247, 787 P.2d 231, 233 (1990). We are therefore not bound by the State's concession below. Thus, we must first determine whether an unlawful seizure occurred.

The Idaho Supreme Court has held that an unlawful seizure occurs when an officer initiates an encounter with an individual in order to seize identification and run a warrants check. *State v. Page*, 140 Idaho 841, 845, 103 P.3d 454, 458 (2004) ("[T]he United States Supreme Court made clear the general rule that in the absence of any basis for suspecting an individual of

---

[1]     Cohagan does not argue the Idaho Constitution affords greater protection, so this Court follows the analysis pursuant to the Fourth Amendment to the United States Constitution.

misconduct, the Fourth Amendment generally does not allow government agents to detain an individual and demand identification."). Here, the senior officer testified that he "wanted to ask [Cohagan] his name and ID him" because the senior officer was concerned that Cohagan provided the junior officer with false identification. The senior officer approached Cohagan and confirmed that he was not M.M.--whom the senior officer knew had an outstanding warrant. The senior officer continued to pursue Cohagan, asked for identification, asked whether Cohagan had any outstanding warrants, and then ran a warrants check. This encounter is precisely the type of encounter that *Page* denounces. By initiating contact with Cohagan solely for the purpose of retaining identification and running a warrants check, the senior officer unlawfully seized Cohagan. The unlawful seizure and arrest of Cohagan yielded the discovery of the methamphetamine, which is at issue here.

Once a defendant demonstrates a causal connection between the police misconduct and the evidence, the burden of proof shifts to the government to show that the unlawful conduct did not taint the evidence, either by demonstrating discovery through independent means, inevitable discovery, or attenuation from the illegality sufficient to dissipate its taint. *Wong Sun*, 371 U.S. at 488; *State v. Cardenas*, 143 Idaho 903, 909, 155 P.3d 704, 710 (Ct. App. 2006). The attenuation doctrine permits the use of evidence that would normally be suppressed as fruit of the police misconduct if the causal chain between the misconduct and the discovery of the evidence has been sufficiently attenuated. *Nardone v. United States*, 308 U.S. 338, 341 (1939); *State v. Hoak*, 107 Idaho 742, 749, 692 P.2d 1174, 1181 (1984). In applying the attenuation doctrine, the test is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488. The Idaho Supreme Court has employed the three-factor test from *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) to determine attenuation: (1) the elapsed time between the misconduct and the acquisition of the evidence; (2) the occurrence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct.[2] *Page*, 140 Idaho at 846, 103 P.3d at 459.

---

[2] *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) indicated that the test is a totality of the circumstances test, yet focused on these three factors.

5

**A.      The Elapsed Time Between the Misconduct and the Discovery of the Evidence**

In analyzing the first factor, the district court concluded that "there was a minimal lapse of time between the seizure of the license and the discovery [of] a valid arrest warrant." Cohagan argues the district court considered the incorrect time period. Cohagan relies on *Page*, which articulated the three-factor test above. The State, however, contends that the relevant time period is between the police misconduct and the point at which there was a lawful basis for police action--such as the discovery of an outstanding warrant. For support, the State cites to *State v. Reynolds*, 146 Idaho 466, 197 P.3d 327 (Ct. App. 2008). In *Reynolds*, this Court articulated the relevant time period to be "the elapsed time between the misconduct and the acquisition of the evidence" but, in analyzing the facts, considered the "lapse of time between the police misconduct and [a third party's] consent" to search. *Id.* at 472, 474, 197 P.3d at 333, 335.

We recognize the discrepancy between *Reynolds* and *Page*, but since the issuance of *Reynolds*, this Court has held that we indeed look at the time between the police misconduct and the discovery of evidence. *See, e.g.*, *State v. Liechty*, 152 Idaho 163, 170, 267 P.3d 1278, 1285 (Ct. App. 2011) ("The state concedes that the time between the seizure and the discovery of methamphetamine was short."). This standard is not new. In fact, *Page* adopted this standard and the entirety of the three-factor test from *Brown*. Moreover, recent United States Supreme Court case law makes clear that the relevant "temporal proximity" is between the police misconduct and the discovery of evidence. *Utah v. Strieff*, ___ U.S. ___, ___, 136 S. Ct. 2056, 2062 (2016) ("First, we look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search."). We therefore agree with Cohagan--the district court used the incorrect time period in analyzing this factor.

Generally, this factor only favors attenuation when "substantial time" has passed between the police misconduct and the discovery of evidence. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2062; *Kaupp v. Texas*, 538 U.S. 626, 633 (2003); *Reynolds*, 146 Idaho at 474, 197 P.3d at 335. For instance, in *Strieff*, the Court held that because "only minutes" passed between an illegal stop and the discovery of drug contraband, this factor weighed against attenuation. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2062.

Here, very little time passed between the senior officer seizing Cohagan's driver's license and the discovery of methamphetamine. Toward the beginning of the video shown in Exhibit 1,

the senior officer seizes Cohagan's driver's license (which is the moment when the police misconduct occurs). The video is only three minutes and fifteen seconds long and ends with the officers arresting Cohagan. The officers found methamphetamine on Cohagan immediately after his arrest. Thus, the discovery of evidence occurred within a few minutes. This factor, therefore, weighs against a finding of attenuation.

**B.      The Occurrence of Intervening Circumstances**

Cohagan concedes that the second factor weighs in favor of attenuation because the officers' discovery of the outstanding warrant is an intervening circumstance. "Where the discovery of an arrest warrant constitutes an intervening circumstance, 'it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated.'" *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006) (quoting *United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997)). Thus, this factor weighs heavily in favor of attenuation.

**C.      The Flagrancy and Purpose of the Police Misconduct**

As to the third factor, determining the flagrancy and purpose of the police misconduct "satisfies the deterrence rationale for application of the exclusionary rule." *United States v. George*, 883 F.2d 1407, 1416 (9th Cir. 1989); *Bainbridge*, 117 Idaho at 250, 787 P.2d at 236. This factor is "particularly important." *New York v. Harris*, 495 U.S. 14, 23 (1990). "In the [Fourth Amendment] context, the 'single and distinct' purpose for the exclusionary rule is deterrence of police violations of that constitutional protection against unreasonable searches and seizures." *United States v. Brookins*, 614 F.2d 1037, 1046-47 (5th Cir. 1980) (quoting *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 413 (1966)). The "exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). Application of the exclusionary rule, however, "does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990).

Flagrant and purposeful conduct occurs when the police misconduct is investigatory in design and is executed "in the hope that something might turn up." *Brown*, 422 U.S. at 605. Conversely, if an officer engages in misconduct while acting in good faith, the conduct is unlikely flagrant or purposeful. *United States v. Washington*, 387 F.3d 1060, 1075-76 (9th Cir. 2004). Similarly, police mistakes that are the result of negligence are not flagrant or purposeful.

7

*Strieff*, ___ U.S. at ___, 136 S. Ct. at 2063. "[S]ystemic error or reckless disregard for constitutional requirements," however, constitutes flagrant or purposeful misconduct. *Herring*, 555 U.S. at 147.

Most recently and while this appeal was pending, the United States Supreme Court addressed the question of what constitutes flagrant or purposeful conduct in the context of what it describes as officer negligence. In *Strieff*, an officer received an anonymous tip reporting narcotics activity at a residence. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2059. Over the course of a week, the officer conducted surveillance of the residence and observed visitors frequently coming and going. *Id.* The officer observed one of the visitors, the defendant, exit the residence and walk toward a nearby store. *Id.* at ___, 136 S. Ct. at 2060. After detaining the defendant in the store parking lot, the officer identified himself and asked the defendant what he was doing at the residence. *Id.* The officer asked for the defendant's identification and relayed the defendant's information to dispatch, who reported that the defendant had an outstanding warrant. *Id.* The officer arrested the defendant and discovered drugs and paraphernalia upon a search incident to arrest. *Id.*

In analyzing whether the drug-related evidence was attenuated from the officer's illegal stop, the Supreme Court considered whether the misconduct was flagrant and purposeful. *Id.* at ___, 136 S. Ct. at 2063. The Supreme Court held that the officer's conduct "was at most negligent" and, in stopping the defendant, the officer "made two good-faith mistakes"--the first being that he did not know how long the defendant was inside the suspected drug residence, and the second being that the officer should have asked whether the defendant would speak with the officer, instead of demanding that the defendant do so. *Id.* The Supreme Court held that "while [the officer's] decision to initiate the stop was mistaken, his conduct thereafter was lawful. The officer's decision to run the warrant check was a 'negligibly burdensome precautio[n] for officer safety.'" *Id.* (quoting *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1616 (2015)). Finally, the Supreme Court noted that "there is no indication that this unlawful stop was part of any systemic or recurrent police misconduct. To the contrary, all the evidence suggests that this stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house." *Id.* After applying the three factors, the Supreme Court concluded the evidence discovered on the defendant was admissible because the illegal stop was "sufficiently attenuated." *Id.*

Because *Strieff* was not issued until recently, the district court relied on *Page* in ruling that the discovery of the outstanding warrant dissipated any taint of police misconduct. In *Page*, an officer observed the defendant walking down the middle of a street late at night while carrying some bags. *Page*, 140 Idaho at 842, 103 P.3d at 455. The officer stopped his patrol vehicle, exited, and approached the defendant. *Id.* at 842-43, 103 P.3d at 455-56. The officer asked if he could speak with the defendant and the defendant responded, "sure." *Id.* at 843, 103 P.3d at 456. The officer inquired into the defendant's well-being and asked for identification. *Id.* As he walked back to the patrol vehicle with the defendant's driver's license in hand, the officer informed the defendant that the officer was going to check the defendant's name. *Id.* Dispatch revealed the defendant had an outstanding warrant for his arrest, so the officer arrested the defendant and discovered drugs during a search incident to arrest. *Id.*

The Idaho Supreme Court acknowledged that the officer's "community caretaker function" justified approaching the defendant to ensure everything was alright when the officer observed the defendant walking down the middle of the street late at night. *Id.* at 844, 103 P.3d at 457. However, the Court also noted its concern "about the implications of a rule allowing law enforcement officers the ability to initiate consensual encounters with pedestrians in order to seize identification and run a warrants check" and concluded the defendant was improperly detained. *Id.* at 845, 103 P.3d at 458. In concluding the evidence was attenuated from the improper seizure, the Court held the officer's misconduct "was certainly not flagrant, nor was his purpose improper" and that the discovery of the outstanding warrant constituted an intervening circumstance. *Id.* at 846-47, 103 P.3d at 459-60. The Court emphasized that "the United States Supreme Court made clear the general rule that in the absence of any basis for suspecting an individual of misconduct, the Fourth Amendment generally does not allow government agents to detain an individual and demand identification." *Id.* at 845, 103 P.3d at 458 (notably, the Court previously acknowledged in the factual background of the opinion that the officer *asked* the defendant for identification).

Here, the district court compared the present case to *Page* and determined that while the officers' conduct in the grocery store was unnecessary and an unlawful detention occurred, "the discovery of an outstanding warrant was clearly an intervening factor between the unlawful seizure and discovery of the evidence . . . [and] it is this intervening factor which permitted the officers to arrest the defendant and conduct the search incident to arrest."

The district court effectively placed significant weight on the intervening circumstance factor and refrained from further analyzing the flagrant and purposeful conduct.

We do consider this factor, taking into account *Strieff*, *Page*, and *Simpson*. The facts of this case closely resemble *Simpson*. In that case, two officers were on patrol when they spotted the defendant. *Simpson*, 439 F.3d at 492. The first officer mistook the defendant for another man the officer knew from a prior arrest who had an outstanding warrant. *Id*. The second officer had a photograph of the man with an outstanding warrant and a written report describing his appearance. *Id.* The officers drove closer toward the defendant, who began to run away. *Id.* In response, the first officer exited the vehicle and chased the defendant. *Id.* During the pursuit, the first officer realized the defendant was not the man the officer knew but continued to chase the defendant because the first officer believed the defendant was attempting to evade the police. *Id.* at 492-93. Upon catching up to the defendant, the second officer, who pursued the defendant from the opposite direction, cut the defendant off. The second officer then announced that he was a police officer. *Id.* at 493. He arrested the defendant and, shortly after the arrest, learned the defendant was not the man with the outstanding warrant. *Id.* However, the officers soon discovered an outstanding warrant for the defendant's arrest. *Id.* Police interrogated the defendant, who made incriminating statements. *Id.* The defendant filed a motion to suppress admission of his post-arrest statements because his initial seizure was unconstitutional. *Id.* In concluding the evidence was admissible, the Eighth Circuit held that the officers' conduct was not flagrant or purposeful. The Court considered that when the second officer arrested the defendant, the second officer mistakenly believed that the defendant was the man the first officer knew from a prior arrest. *Id.* The first officer continued his pursuit after realizing he mistook the defendant for someone else, but only because the defendant was attempting to evade police in an area known for narcotics trafficking. *Id.* Thus, the officers acted in good faith based on mistake of fact and in response to the defendant's attempt to evade police.

In *Simpson*, *Page*, and *Strieff*, the courts concluded the officers' misconduct was not flagrant and purposeful. However, this case is different. Here, the officers were on patrol in the middle of the day when they observed Cohagan on a street corner, believing he was M.M.-- whom the senior officer believed had an outstanding warrant. The record does not suggest the specific area was known for drug or other criminal activity, or that the officers were conducting surveillance or some other investigation. They pursued Cohagan into a grocery store. Shortly

10

after entering the grocery store, the junior officer made contact with Cohagan, identified Cohagan, and informed the senior officer that the man was not M.M. Nonetheless, the senior officer sought out Cohagan and, from ten or fifteen feet away, also visually confirmed the man was not M.M. The senior officer confronted Cohagan, requested identification, and inquired as to whether Cohagan had any outstanding warrants. The senior officer testified that he believed Cohagan's behavior at the street corner was suspicious, but there is no evidence that Cohagan attempted to run from the officers or that a basis existed for suspicion of criminal activity. Unlike *Simpson*, the senior officer did not operate under a mistake of fact regarding Cohagan's identity, and therefore there was no basis for good faith or negligence.

Moreover, the senior officer's misconduct was not a precaution for officer safety or connected with a bona fide investigation like the officer's conduct in *Strieff*. Unlike the officer in *Page*, the senior officer was not pursuing a community caretaker role. The second approach of Cohagan zeroed in on securing Cohagan's identification for a warrants check. The unlawful conduct of seizing Cohagan's license was investigatory in design, and its purpose was clear--to determine solely whether Cohagan had outstanding warrants. Accordingly, the misconduct here was both flagrant and purposeful.[3] This factor therefore weighs against attenuation.

In sum, we conclude that based on the totality of the circumstances, the evidence is not attenuated so as to be purged of the taint from the senior officer's misconduct. While the second factor weighs heavily in favor of attenuation, the very purpose of the exclusionary rule is to deter law enforcement from performing an investigatory stop to benefit police at the expense of an individual's protected rights. The district court therefore erred in denying Cohagan's motion to suppress.

### III.

### CONCLUSION

The district court erred in determining the evidence seized by police was admissible as having been purged from the taint of the unlawful detention. We therefore reverse the district court's order denying Cohagan's motion to suppress and vacate Cohagan's judgment of conviction.

Chief Judge MELANSON **CONCURS**.

---

[3] We share the Idaho Supreme Court's concern regarding officers initiating consensual encounters for the sole purpose of obtaining identification to check for outstanding warrants.

Judge HUSKEY, **DISSENTING**

I dissent from the majority opinion for two reasons. First, given the precedent of both *State v. Page*, 140 Idaho 841, 103 P.3d 454 (2004) and *Utah v. Strieff*, ____ U.S. ____, 136 S. Ct. 2056 (2016),[1] I believe we are constrained to find the officer's conduct throughout the encounter with Cohagan was lawful and thus, I do not believe there is any infringement of Cohagan's Fourth Amendment rights. Second, I believe we are similarly constrained to find that even if the officer did engage in some initial illegal detention, his behavior was neither flagrant nor purposeful, and therefore there is no basis to suppress the evidence.

The threshold question we must answer is whether there was an unconstitutional seizure that implicated the Fourth Amendment. I do not believe there was. I agree with the majority that whether the officer's retention of Cohagan's license constituted an unlawful seizure is not a factual question, but rather a legal question which this Court freely reviews. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). Moreover, we are not limited by the State's opinion on a legal issue. *See State v. Bower*, 135 Idaho 554, 558, 21 P.3d 491, 495 (Ct. App. 2001); *see also State v. Green*, 158 Idaho 884, 886, 354 P.3d 446, 448 (2015).[2] The district court held, and the majority affirms, that the second encounter between Cohagan and the officer began as a consensual encounter. I agree. However, despite my accord with this conclusion, I disagree with the district court's and the majority's conclusion that the consensual encounter transformed into an illegal detention.

The majority relies on *Page* for the proposition that retaining a defendant's identification during a consensual encounter to determine whether there was an outstanding warrant for the defendant constitutes an illegal seizure. *Id.* at 845, 103 P.3d at 458. And *Page* would certainly

---

[1]     I do not address the majority's reliance on *United States v. Simpson*, 439 F.3d 490 (8th Cir. 2006), because I do not think it particularly important to the resolution of this case. The majority indicates the facts of this case closely resemble the facts of *Simpson*, but despite those claimed similarities, reaches a different legal conclusion than *Simpson*. I am unclear how the legal result is different if the facts are sufficiently similar to warrant mention.

[2]     I recognize my dissent in *State v. Garcia-Rodriquez*, Docket No. 42730 (Ct. App. June 9, 2016), *rev. granted*, but the current state of the law is this Court freely reviews questions of law. And, where a ruling in a criminal case is correct, though based upon an incorrect reason, it still may be sustained upon an alternative theory. *State v. Kerley*, 134 Idaho 870, 873, 11 P.3d 489, 492 (Ct. App. 2000).

dictate that conclusion in the absence of the more recent holding in *Strieff* which specifically addressed that precise issue and found such behavior to be legal. As such, I believe the majority incorrectly relies on *Page*--a case both prior in time and by a lower court--as controlling authority to find the officer's conduct in retaining the license constituted an illegal seizure.

In *Page*, an officer observed Page walking down a residential street at 2:00 a.m. carrying some bags. *Id.* at 842, 103 P.3d at 455. The officer approached Page and asked if he could talk to him; Page agreed. *Id.* After inquiring about Page's well-being, the officer asked for Page's identification and then retained the identification while the officer went back to his patrol vehicle and discovered an active arrest warrant for Page. *Id.* The officer arrested Page and searched him incident to arrest, discovering methamphetamine. *Id.* Page was charged with possession of a controlled substance and filed a motion to suppress, which was granted by the district court. *Id.*

On appeal, the Court held the initial encounter was consensual and was accomplished pursuant to the officer's community caretaker function. *Id.* at 844, 103 P.3d at 457. However, the Court also held the totality of the circumstances demonstrated no compelling need for the officer to seize the identification and conduct a warrants check, nor were there facts present that legitimized the detention of Page once the officer determined, pursuant to his community caretaker function, that Page was not in need of assistance. Further, there was no particularized or objective justification for detaining Page. *Id.* at 845, 103 P.3d 458. Given the initial illegality, the Court analyzed the three factors set forth in *Brown v. Illinois*, 422 U.S. 590 (1975) to determine whether the initial illegality was sufficiently attenuated from the subsequently discovered evidence such that the evidence would be admissible. The Court concluded the existence of a valid warrant sufficiently attenuated the initial misconduct from the subsequent discovery of the evidence. *Page*, 140 Idaho at 847-48, 103 P.3d at 459-60. In examining the third *Brown* factor--"flagrant and purposeful" misconduct--the Idaho Supreme Court noted the *Brown* Court "did not 'condone' the [officer's] conduct [in the case] but ruled that it was not so shocking as to 'tilt the scales against attenuation.'" *Page*, 140 Idaho at 846, 204 P.3d at 459. Given that standard, the *Page* Court noted the officer's conduct was not flagrant, nor was his purpose improper, and the Court reversed the granting of the motion to suppress. *Id.* at 846-47, 103 P.3d at 459-60.

In *Strieff*, the United States Supreme Court addressed the same issue presented in *Page*. There, after receiving an anonymous tip, the officer surveilled a house for suspected drug

13

activity. *Strieff*, ____ U.S. at ____, 136 S. Ct. at 2059. The officer surveilled the house for about a week and noticed visitors who stayed only a short period of time, which raised the officer's suspicion that drugs were being dealt from the house. *Id*. One day the officer watched Strieff leave the house. *Id*. at ____, 136 S. Ct. at 2060. The officer detained Strieff and requested Strieff produce his identification card, which Strieff produced. *Id.* The officer retained the identification while conveying the information to dispatch. *Id*. Dispatch confirmed there was an outstanding arrest warrant for Strieff. *Id*. The officer arrested Strieff, searched him incident to arrest, and found methamphetamine. *Id*.

The United States Supreme Court recognized there was no reasonable suspicion to detain Strieff, but ultimately held the existence of a valid, pre-existing warrant sufficiently attenuated the discovery of evidence from the initial illegality. *Id*. at ____, 136 S. Ct. at 2063. In reaching this conclusion, the Court analyzed the three factors set forth in *Brown*. *Strieff*, ____ U.S. at ____, 136 S. Ct. at 2061-62. When discussing the third factor, whether the police misconduct was both flagrant and purposeful, the Court noted: "For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* at ____, 136 S. Ct. at 2064.

The Court found the officer was at most negligent in stopping Strieff and thereafter, made two good faith mistakes, neither of which was flagrant misconduct. *Id*. at ____, 136 S. Ct. at 2063. The officer's first mistake was concluding Strieff may have been conducting a drug transaction. *Id*. Second, the officer should have asked Strieff whether he would speak with the officer, instead of demanding that Strieff do so. *Id*.

The United States Supreme Court went on to reason that while the officer's decision to initiate the stop was mistaken, his conduct in retaining Strieff's identification was lawful because the officer's decision to run the warrants check was a "negligibly burdensome precautio[n]" for officer safety. *Id*. (citing *Rodriguez v. United States*, 575 U.S. ____, ____, 135 S. Ct. 1609, 1616 (2015)). Once the officer discovered the active warrant for Strieff, the officer was well within his authority to arrest Strieff and search him incident to the arrest. *Strieff*, ____ U.S. at ____, 136 S. Ct. at 2063 (citing *Arizona v. Gant*, 556 U.S. 332, 339 (2009)).

It is not clear from the analysis in *Strieff* how the *Rodriguez* holding applies to the *Strieff* facts, since the holding in *Rodriguez* appears to rely, in part, on the inherent danger of a traffic stop, and no such inherent danger appears to exist in *Strieff*. Nonetheless, the Court clearly states

14

that the *Rodriguez* holding applies to the facts of the *Strieff* case when it explains: "While [the officer's] decision to initiate the stop was mistaken, his conduct thereafter [retaining Strieff's license to run a warrants check] was lawful." *Strieff*, ____ U.S. at ____, 136 S. Ct. at 2063. As such, retaining the identification to check for warrants, even where the identification is obtained in violation of the Fourth Amendment, is lawful behavior. *Strieff*, ____ U.S. at ____, 136 S. Ct. at 2063.

Additionally, the *Strieff* Court held there was no indication that the unlawful stop was part of any systemic or recurrent police misconduct, and the evidence suggested that the stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house. *Id.* As a result, the Court ultimately concluded the officer's "errors in judgment" did not rise to the level of a purposeful or flagrant violation of Strieff's Fourth Amendment rights. *Id.* The Court reached this conclusion regardless of the officer's motive in making the initial contact and found that, even if the officer's purpose was to engage in a fishing expedition to "find out what was going on [in] the house," nothing prevented him from approaching Strieff simply to ask. *Id*. at _____, 136 S. Ct. at 2063 (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

The *Strieff* Court discussed the dissent's concern that the officer's conduct was flagrant because he detained Strieff without reasonable suspicion. *Strieff*, ____ U.S. at ____, 136 S. Ct. at 2064. The *Strieff* majority concluded that the argument raised by the dissent conflated the standard for an illegal stop with the standard for flagrancy because for the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure. *Id.*

Thus, in reading *Page* and *Strieff* together, the *Strieff* holding goes one step further than the *Page* holding because in *Page*, the Idaho Supreme Court held that retaining the identification was violative of the Fourth Amendment. *Strieff*, however, holds such conduct is legal.

Based on the above, what we have in this case is a consensual encounter between the officer and Cohagan. The officer then lawfully retained Cohagan's identification while checking to see if Cohagan had any outstanding warrants. Upon discovering the outstanding warrant, the officer legally arrested Cohagan and legally searched him incident to arrest. As a consequence, there was no infringement upon Cohagan's Fourth Amendment rights at all. In the absence of a triggering Fourth Amendment violation, we need not address the attenuation doctrine.

15

Nonetheless, even if the officer illegally seized Cohagan when the officer retained Cohagan's identification, I cannot find any flagrant or purposeful misconduct on the part of the officer to justify suppressing the evidence obtained from the search of Cohagan. Under the federal Constitution, applying the exclusionary rule and suppressing evidence is done for two purposes: (1) to deter lawless conduct by law enforcement and (2) to close the doors of the courts to any use of evidence unconstitutionally obtained. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). The attenuation doctrine analyzes situations where there is some Fourth Amendment violation, and the court must determine whether the resulting evidence was obtained by exploitation of that illegality or, instead, by means sufficiently attenuated from that illegality such that the taint of the illegality is purged. *See Brown*, 422 U.S. 590. This requires a three-part analysis as set forth in *Brown* and as explained in the majority opinion. *Id.* at 603-04.

Assuming for purposes of argument that retaining Cohagan's identification to check for warrants constituted an illegal detention, I agree with the majority's analysis of the first two *Brown* factors, but I disagree with its analysis of the third factor: whether the officer's conduct was so flagrant and purposeful as to require suppression of the evidence.

The majority, despite citing to *Page*, *Strieff*, and *Simpson*, all which hold there was no flagrant and purposeful misconduct, reaches the opposite conclusion in this case for four reasons: (1) the contact with Cohagan occurred during the day; (2) unlike the officers in *Simpson*, the officer did not mistakenly believe Cohagan was someone else at the time the officer contacted Cohagan; (3) retaining Cohagan's identification was neither a precaution for officer safety or connected with a bona fide investigation as it was in *Strieff*; and (4) unlike the officer in *Page*, the officer in this case was not pursuing a community caretaker function.

Each of the reasons listed by the majority above may establish why there was no probable cause for the alleged initial illegal seizure, but they do not point to any other behavior that is "more severe" than the alleged initial misconduct. As a result, there is no basis to find flagrant misconduct that would justify suppressing the evidence. Instead, the majority has adopted the analysis specifically rejected by the *Strieff* Court and conflated the standard for determining whether there was an initial illegality with the standard for subsequently determining whether the conduct was flagrant and purposeful.

The basis for finding flagrant misconduct is the majority's conclusion that, "the unlawful conduct of seizing Cohagan's license was investigatory in design, and its purpose was clear--to

16

determine solely whether Cohagan had outstanding warrants." But, that conclusion is flawed for two reasons. First, as discussed above, it conflates the standard for the illegal seizure with the standard for flagrancy--a position specifically rejected by the *Strieff* majority. Second, it relies on the officer's motive rather than his actions. The majority relies on what it perceives to be the officer's improper motive in retaining the license to find such conduct is flagrant and purposeful misconduct. The officer's motive is legally insufficient to justify suppressing the evidence for three reasons. First, the district court made no factual findings regarding the officer's motive. Second, the officer's stated purpose for the contact was to investigate what the officer believed to be suspicious, evasive behavior--a legitimate reason for law enforcement investigation. Third, even if the officer's motive was an investigatory fishing expedition, pursuant to *Strieff*, such conduct is legal.

The district court made no factual findings regarding the officer's motive. Yet here, the majority makes implicit factual findings to reverse, not support, the trial court's order; a proposition for which there is little, if any, legal support. *State v. Floyd*, 159 Idaho 370, 372, 360 P.3d 379, 381 (Ct. App. 2015) (holding the court may examine the record to determine implicit findings which would support the trial court's order). As such, we should not make implicit factual findings of the officer's inappropriate motive when to do so is neither supported by the district court's finding, clearly reflected in the record, or used to support the trial court's order.

Instead of looking to implicit factual reasons for the officer's behavior, we can look to what the record explicitly provides. The court found the officer's stated purpose in contacting Cohagan a second time was to confirm Cohagan's identity. The officer testified that he contacted Cohagan to confirm Cohagan's identify and wanted to look at his identification "because of the activity outside of the store that appeared to be evasive." The officer described the activity he believed was evasive. Thus, the officer's stated purpose of his investigation was to determine why Cohagan was acting evasively. Cohagan argues the officer's claim of Cohagan's evasive behavior was just a pretext to justify stopping Cohagan and asking for his identification. Moreover, whether there was a legitimate or pretextual basis, or a valid or invalid motive for the encounter, is irrelevant when the initial encounter is consensual, as it was in this case. Even if the officer retained the license to investigate whether Cohagan had any outstanding warrants, such behavior is exactly the same behavior the Court said was legal in *Strieff*.

Finally, even if the officer's stated purpose seems a thinly-veiled attempt to portray a suspicionless stop as a legitimate inquiry, in order to suppress the evidence, we must find the misconduct more severe than simply as the basis for the initial detention. Here, we cannot do so. It matters not whether the officer's purpose was to engage in a fishing expedition to determine if Cohagan had a warrant, as nothing prevented the officer from approaching Cohagan to so inquire; such behavior is perfectly constitutional. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2064 (citing *Bostick*, 501 U.S. at 434) (holding that even if the officer's purpose was to engage in a fishing expedition to "find out what was going on [in] the house," nothing prevented him from approaching Strieff simply to ask). Thus, regardless of the officer's motive, the officer's subsequent behavior was lawful and so there was no misconduct in this case, let alone any flagrant misconduct. Without misconduct, there is no basis upon which to suppress the resulting evidence. Here, the majority has pointed to no misconduct other than the alleged initial illegality of retaining the license.

In this case, I cannot find any infringement on Cohagan's Fourth Amendment rights such that the attenuation doctrine applies. And, even if there was some initial illegality, the officer's subsequent behavior was lawful and, therefore, could not be flagrant and purposeful. Consequently, the seized evidence need not be suppressed. I dissent from the majority opinion and would affirm the decision of the district court.